**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PROFESSIONAL SPORT SERVICE FI OY, <br><br>      Plaintiff, <br><br> v. <br><br> JAY GROSSMAN and JMG SPORTS AGENCY, INC., <br><br>      Defendants. | Civil Action No. 1:24-cv-12351 |

**DEFENDANTS JAY GROSSMAN AND JMG SPORTS AGENCY, INC.'S**
**<u>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

**JAY GROSSMAN and**
**JMG SPORTS AGENCY, INC.,**

By their attorneys,

Joseph D. Lipchitz (BBO # 632637)
Jacob A. Tosti (BBO # 704007)
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA  02116
(617) 723-3300
joseph.lipchitz@saul.com
jacob.tosti@saul.com

Dated:  October 8, 2024

## **INTRODUCTION**

Having absolutely no judgment against Jay Grossman or his Massachusetts company JMG Sports Agency, Inc. ("JMG-MA") and having failed to sue them in Plaintiff's initial arbitration brought <u>over six (6) years ago</u> against Puck Agency, LLC ("Puck") arising from a breach of contract claim between Puck and PSS, or two (2) years ago in an ancillary arbitration related to that same agreement, Plaintiff ("PSS") now comes to this Court seeking the "extraordinary remedy" of injunctive relief of attempting to freeze Mr. Grossman's personal assets based on the manufactured and meritless claim that he is somehow <u>now</u> responsible as the "alter ego" for the breach of contract judgment against Puck obtained back in 2018. As a threshold matter, PSS' belated claims are barred as a matter of black-letter law by res judicata. <u>See</u>, <u>e.g.</u>, <u>Doe v. Urohealth Sys., Inc.</u>, 216 F.3d 157, 161-62 (1st Cir. 2000) (<u>reversing</u> dismissal *without prejudic*e against non-party, alleged to have been the alter-ego of the defendant because res judicata would bar claims, with prejudice; "res judicata bars 'parties to an original action and those in privity with such parties' from relitigating 'all the issues that were tried or might have been tried in the original suit'"); <u>Aunyx Corp. v. Cannon U.S.A., Inc.</u>, 978 F.2d 3, 6-7 (1st Cir. 1992) (affirming dismissal given that res judicata barred claims brought by plaintiff's alleged alter-ego given prior agency adjudication involving plaintiff); <u>Safeguard Properties Mgmt., LLC v. Zoll</u>, 2022 WL 16838781, *5 (D. Mass. Nov. 8, 2022) (Rule 12(b)(6) dismissal against alleged alter-ego because claims were barred by res judicata given prior arbitration).

In addition, Plaintiff's Complaint and motion are riddled with false statements in a desperate effort to obfuscate the obvious: PSS obtained a judgment against a corporate entity that was defunct at the time of the initial arbitration and had no assets long before PSS ever made a claim. <u>See</u> <u>Evans v. Multicon Const. Corp.</u>, 30 Mass. App. Ct. 728, 737-38 (1991) (declining attach assets of prior owners of corporation no longer in existence; "The risk that a defendant, without fraud and in the normal course of business operations, may become unable to answer to a judgment is inherent in any

civil litigation").  By way of limited example, PSS <u>falsely</u> asserts:

- "To avoid paying the over $1 million awarded to PSS, Mr. Grossman has … "sold off substantial personal assets, and (iii) flatly ignored federal court judgments and asset discovery." Compl. at ¶1.
  ***Reality: Mr. Grossman has no judgment against him.  No asset discovery was ever served on him, precisely because he is not a judgment debtor.  The only asset that Plaintiff identifies being "sold off" is Mr. Grossman's marital home in New York, which was sold in 2021, after COVID and after Mr. Grossman moved to Massachusetts in 2016 following his youngest child's high school graduation.  Of course, he and his wife had every right to sell their marital home because there was no judgment, claim or threatened claim against them.***

- "Mr. Grossman caused PSS to contract with a fictive entity [Puck]."  Compl. at ¶2.
  ***Reality: Puck, which was a Delaware limited liability company, was a lawfully incorporated sports agency business when it entered into the 2012 Agreement with PSS, having operated in New York from 2001 to 2015, generating income and filing federal and New York tax returns during that time.***

- "Following the initial arbitration, [Mr. Grossman] cleared the only bank account of which PSS had a record."  Memo at 1.
  ***Reality: Puck ceased operations in 2015 - - some three (3) years <u>before</u> PSS brought its arbitration claim - - for reasons having nothing to do with PSS.  Puck's bank account at Bank of America had no funds <u>before</u> PSS ever commenced the 2018 arbitration precisely because the business had not been operating for over two years.***[1]

Plaintiff's motion is rendered even more outrageous given that Mr. Grossman is suffering from Stage IV lung cancer and requires his personal assets for his ongoing care and treatment and that of his family.  Indeed, PSS' motion violates every principle governing equitable relief.  PSS is not entitled to extraordinary and drastic injunctive relief for seven (7) reasons.

***First***, PSS' motion seeks to alter, not preserve the status quo. <u>Chiara v. Dizoglio</u>, 59 F. Supp. 2d 193, 196 (D. Mass. 1999) (denying motion for a preliminary injunction; "the First Circuit has cautioned that a preliminary injunction that has the effect of disturbing, rather than preserving, the status quo 'normally should be granted only in those circumstances when the exigencies of the

---

[1] So that the Court has a clear timeline of the events, the declarations of Mr. Grossman ("Grossman Decl.") and his long-time accountant, Allen Gross ("Gross Decl.") are submitted herewith.

situation demand such relief").

*Second*, PSS has no judgment against Mr. Grossman or JMG-MA.  As a matter of black-letter law, Mr. Grossman, as the former owner and officer of Puck, as a Delaware LLC, or JMG-NY, a New York Corporation, is not personally responsible for the debts and obligations of a company.  See Del. Code Ann. tit. 6, § 18-303; Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc., 107 A.3d 1082, 1096 (Del. Ch. 2014) ("The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations. Indeed, limited personal liability is one of the core benefits of creating a separate business entity"); NY Limit Liab Co § 609; Treeline Mineola, LLC v Berg, 2005 WL 2292056 (N.Y.A.D. 2 Dept., Sep. 19, 2005)  (declining to hold sole shareholder, officer, and director liable for debt of New York corporation; "in view of the well established fact that a business can be incorporated for the very purpose of enabling its proprietor to escape personal liability, the corporate form is not lightly to be disregarded.").  As set forth in the accompanying declarations, Mr. Grossman operated and maintained each business as separate from himself.

*Third*, if PSS believed that Mr. Grossman was the alter ego of Puck, it was obligated to assert those claims in the original arbitration in 2018, or if it believed he was the alter-ego of JMG-NY, it was obligated to assert that claim in the ancillary arbitration in 2022.  Having failed to do so, its claims are barred by res judicata, as a matter of law.

*Fourth*, PSS' claims, which arise from Puck's liability under the 2012 Agreement, are time-barred in any event by the operative statute of limitations.

*Fifth*, PSS has utterly failed to set forth any facts establishing any fraudulent conveyance of any kind.  The "best" that it can do is assert that Puck closed a bank account after it had ceased operations years **before** any arbitration was even commenced and that Mr. Grossman made the life decision to sell his marital home after his children had graduated and he had moved to Massachusetts. Both transactions were made for reasons wholly unrelated to PSS and Mr. Grossman's home was

3

never an asset available to PSS, as a judgment creditor.  See Admiral Metals Servicenter Co., Inc. v. Micromatic Prod. Co., 2003 WL 369709, at *6 (Mass. Super. Jan. 24, 2003) (granting summary judgment for lack of fraudulent intent; "Prior to these transfers, there was no actual or threatened litigation. In fact, the present litigation began several years later"); Alford v. Thibault, 83 Mass. App. Ct. 822, 828 (2013) (affirming dismissal; "[w]here a creditor 'could not have reached the property before the conveyance, it follows that the conveyance itself could not have been fraudulent").

**Sixth**, PSS has failed to make the required "clear showing" of irreparable harm, with its Complaint and motion riddled with rank speculation and assertions "on information and belief." See, e.g., Compl., ¶¶ 25, 29, 40.  This cannot form the basis for injunctive relief. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (reversing preliminary injunction based on "possibility" of harm).  Even more fundamentally, PSS is pursuing money damages against non-judgment debtors, and its delay of over six (6) years in bringing this motion demonstrates that there is no irreparable harm whatsoever.

**Seventh**, the balance of harms favors Mr. Grossman.  PSS' proposed injunction would freeze the personal assets of Mr. Grossman, who is suffering from Stage IV cancer and undergoing chemotherapy and radiation treatment.

## FACTUAL BACKGROUND

Jay Grossman is a sports agent by profession, who has been in practice representing professional ice hockey players since 1985.  See Grossman Decl. at ¶1.  He has been a Certified Agent in good standing with the National Hockey League Players' Association since the inception of its Certified Agent program in the early 1990s, and has represented over one thousand professional athletes over the course of his career.  Id. at ¶2.  Since July 2022, he has been the President of JMG Sports Agency, Inc. ("JMG-MA"), a Massachusetts-based sports agency that represents hockey players in North America, primarily in the National Hockey League.  Id. at ¶3.

## Puck Agency, LLC Was An Active And Ongoing Delaware LLC from 2001 to 2015

On June 27, 2001, Mr. Grossman formed a sports agency business named Puck Agency, LLC ("Puck"), a Delaware limited liability company.  He owned and operated Puck from that time until 2015, when Puck ceased doing business, as set forth below.  His business' income has always been generated solely from commissions paid by players represented by the agency business.  At all times from 2001 through the cessation of its business operations in 2015, Mr. Grossman operated Puck as a separate legal entity.  Puck was properly capitalized, paid its expenses in the ordinary course of its business, filed its own separate federal and state tax returns, maintained its own corporate bank accounts separate from Mr. Grossman's personal bank accounts, paid profit distributions from time to time to Mr. Grossman, all of which were reported on Mr. Grossman's and Puck's tax returns.  Puck's funds were not used to pay Mr. Grossman's personal, non-business-related expenses or debts or those of any other individual.  Id. at ¶¶5-6, 42-47; Gross Decl. ¶¶16-22.

On July 30, 2012, Puck entered into a contract with Professional Sport Service Fi Oy ("PSS") concerning the referral of ice hockey players in exchange for a share of any commission if they were signed to an NHL contract (the "2012 Agreement").  Grossman Decl. at ¶7 and Ex. B.  The parties to the 2012 Agreement are Puck and PSS. Mr. Grossman was not, and has never been, a party to the 2012 Agreement. Further, JMG-MA and the New York entity named JMG Sports Agency, Inc.— both of which are discussed below—are not and have never been parties to the 2012 Agreement.  Id. at ¶8.

PSS' current claim that Puck was a nonexistent or inactive entity at the time of the 2012 Agreement is not accurate.  Puck was an active and existing sports agency business when it entered into the 2012 Agreement, generating income and paying expenses in the ordinary course of its business.  After 2012, Puck continued to conduct business as a sports agency until it ceased doing business in 2015, as set forth below, some three (3) years before PSS ever made a claim.  Id. at ¶9.

**JMG-NY Was Formed in Late 2014, For Reasons Wholly Unrelated to PSS**

In 2014, based upon trends relating to consolidation in the industry and Mr. Grossman's receipt of inquiries exploring the potential future acquisition of sports agencies, his long-time accountant, Allen Gross, advised him that it would be more advantageous to conduct a sports agency business as a corporation, rather than a limited liability company. Based upon Mr. Gross' advice, on December 19, 2014, Mr. Grossman formed JMG Sports Agency, Inc., a corporation organized under the laws of New York ("JMG-NY") and decided to operate JMG-NY as a sports agency business, and discontinue operating Puck.  In so doing, he publicly filed a Certificate of Incorporation in New York.  Accordingly, in 2015, JMG-NY started doing business, and Puck permanently ceased its business operations.  See Grossman Decl. at ¶¶11-12; Gross Decl. at ¶¶5-6.[2]

JMG-NY was at all times during its existence a separate entity from Puck and separate from Mr. Grossman.  JMG-NY was properly capitalized, paid its expenses in the ordinary course of its business, had a tax identification number different from that of Puck and filed its own separate federal and state tax returns, maintained its own corporate bank accounts separate from Mr. Grossman's personal bank accounts, and paid profit distributions from time to time to Mr. Grossman, all of which were reported on Mr. Grossman's and JMG-NY's tax returns.  JMG-NY's funds were not used to pay personal, non-business-related expenses. Mr. Grossman's decisions to form JMG-NY and discontinue Puck's operations were wholly unrelated to PSS or the 2012 Agreement.  In fact, both the formation of JMG-NY and the cessation of Puck's operations occurred years ***before*** PSS first commenced arbitration in Finland against Puck concerning the 2012 Agreement, in April 2018.  See Grossman

---

[2] Puck did not actively conduct business after 2015.  However, Puck filed federal and state tax returns from 2016 through 2018, because in 2013, Puck received a lump sum commission payment that Puck amortized over a period of five years on its tax returns, through 2017.  As of December 2017, Puck's bank account had a zero balance.  Thereafter, in 2018, Puck filed its last tax return—which it designated as a 'final return'— showing no income and no other business activity. Puck's bank account—which still had a zero balance—was closed in July of 2018, after Puck filed its final return. Grossman Decl. at ¶¶13-14; Gross Decl. ¶¶7-8.

Decl. at ¶¶13-15, 49-54; Gross Decl. at ¶¶7-9; 22-28.

### Grossman Moved to Massachusetts in 2016, and Sold His Home in New York in 2021, For Personal Reasons Wholly Unrelated To PSS And The 2012 Agreement

Prior to 2016, Mr. Grossman's primary residence—and that of his wife, Nancy—was in Chappaqua, New York.  Mr. Grossman and his wife owned that marital home jointly.  In 2001, Mr. Grossman and his wife purchased a second home for their family, located in Chilmark, Massachusetts.  That home is, and since 2001 always has been, jointly owned by Grossman and his wife.  Neither Puck, nor JMG-NY, nor JMG-MA, has ever had any ownership interest in either of the New York and Massachusetts homes.  In fact, neither Puck, nor JMG-NY, nor JMG-MA have ever had any ownership interest in any real estate.  Grossman Decl. at ¶¶16-18; Gross. Decl. at ¶¶10-11.

In 2016, Mr. Grossman's youngest child graduated from high school and began attending college. Given this change in his family life, Mr. Grossman and his wife discussed moving from New York to their home in Chilmark, Massachusetts.  Accordingly, in 2016, Mr. Grossman and his wife began living primarily at their Chilmark, Massachusetts home throughout the year.  Mr. Grossman and his wife enjoyed living in Massachusetts, and they soon became settled there.  In 2016, Mr. Grossman relinquished his New York driver's license and obtained a Massachusetts driver's license.  Similarly, he registered to vote in Massachusetts.  He also filed non-resident tax returns in New York and continued to do so until 2022, when JMG-NY ceased operations.  Grossman Decl. at ¶¶16-18.

In January of 2021, Mr. Grossman and his wife decided to sell their home in Chappaqua, New York because they had enjoyed living and working in Massachusetts for several years and there was a favorable market for real estate sellers following the COVID-19 pandemic.  The decisions Mr. Grossman and his wife made together to move to Massachusetts in 2016, and eventually sell their home in New York in 2021, were wholly unrelated to PSS, the 2012 Agreement, or any arbitration.  Id. at ¶¶21-22.  Indeed, there was no claim, threatened claim, or arbitration judgment against them when they moved in 2016 or sold their marital home in 2021.

**The First Finnish Arbitration in 2018 Against Puck**

Two years ***after*** Mr. Grossman moved to Massachusetts and more than three years ***after*** he incorporated JMG-NY, on April 23, 2018, PSS initiated an arbitration proceeding against Puck in Finland (the "2018 Arbitration").  Puck was represented by counsel in that proceeding. PSS did not sue Mr. Grossman personally in the 2018 Arbitration, nor did it sue JMG-NY.  PSS did not claim in the 2018 Arbitration that Mr. Grossman was individually liable to PSS in any way, and did not claim that JMG-NY was liable to PSS in any way.  Id. at ¶¶23-25.

On November 22, 2018, the arbitrator issued an award against Puck in the amount of $323,327.58, exclusive of interest.  At that time, Puck had been inactive for years, and had no assets. Id. at ¶¶13-14, 25.  On June 24, 2019, PSS brought an action in the United States Court for the Southern District of New York, titled Professional Sport Service FI OY v. Puck Agency LLC, Civil Action No. 7:19-cv-05904-CS, seeking to domesticate the arbitration award, and seeking an additional  award of $650,187 for purported "future commissions" that the Arbitrator never awarded. In that proceeding, PSS did not sue Mr. Grossman personally, nor did it sue JMG-NY.  Further, PSS did not claim in that proceeding that Mr. Grossman was individually liable to PSS in any way, and did not claim that JMG-NY was liable to PSS in any way.  In November 2019, the Court rejected PSS' claim for "future commissions," but entered judgment against Puck in accordance with the order from the 2018 Arbitration. The Court did not enter judgment against Mr. Grossman personally or against JMG-NY. Id. at ¶¶27-30.

**JMG-MA Was Formed in 2022, For Reasons Wholly Unrelated To PSS**

As of 2022, Mr. Grossman had been living in and working from Massachusetts for six years, and, as noted above, he and his wife had sold their home in New York in 2021.  Based on these circumstances, in 2022, Mr. Gross advised Mr. Grossman to form a Massachusetts corporation because he no longer had any personal or professional nexus to New York, and there was no need for

JMG-NY—which was no longer doing business in New York—to continue incurring administrative expenses relating to New York tax and corporate filings.  Accordingly, based upon Mr. Gross' recommendation, in July 2022, Mr. Grossman formed JMG-MA, a corporation organized under the laws of Massachusetts, and ceased JMG-NY's business operations.  See Grossman Decl. at ¶¶31-33; Gross Decl. at ¶¶10-15.

JMG-MA is a separate entity from both JMG-NY and Puck.  It is assigned a tax identification number separate from that of JMG-NY and Puck, files its own tax returns, and uses its own separate bank separate account.  JMG-MA is solvent and adequately capitalized to conduct its business.  It pays its expenses when due in the ordinary course.  JMG-MA's funds are not used to pay Mr. Grossman's personal, non-business-related expenses or debts, or those of any other individual.   Mr. Grossman's decisions to form JMG-MA and discontinue JMG-NY's operations were based upon the location of his residence in Massachusetts and the related advice of his accountant and had nothing to do with PSS.  See Grossman Decl. at ¶¶34, 55-61; Gross Decl. at ¶¶13, 29-35.

### Second Finnish Arbitration Action in 2022

On February 28, 2022, PSS initiated a second arbitration proceeding in Finland against Puck and JMG-NY, claiming that these parties were liable for alleged breaches of the 2012 Agreement between Puck and PSS (the "2022 Arbitration").[3] PSS did not sue Mr. Grossman personally in the 2022 Arbitration, nor did it sue JMG-MA.  PSS did not claim in the 2022 Arbitration that Mr. Grossman was individually liable to PSS in any way, and did not claim that JMG-MA was liable to PSS in any way.  The arbitrator issued a default award against Puck and JMG-NY on January 4, 2024. As of January 4, 2024, Puck was a long-inactive entity with no assets, and JMG-NY also had no assets and had been inactive for nearly two years.  See Grossman Decl. at ¶¶35-38.

---

[3] Both respondents defaulted, because Puck had been inactive and out of business for years, and JMG-NY decided not to waste money to defend an overseas action based upon a contract to which it was not a party, and where claims would in any event be barred by res judicata. See Grossman Decl. at ¶35.

In March of 2024, PSS initiated an action in the U.S. District Court for the Southern District of New York to confirm the award, titled <u>Professional Sport Service FI OY v. Puck Agency, LLC and JMG Sports Agency, Inc.</u>, Civil Action No. 7:24-cv-02022-KMK.  No one appeared for Puck or JMG-NY, so the Court entered judgment against Puck and JMG-NY.  No arbitrator or Court has ever entered an award or judgment against Mr. Grossman personally or JMG-MA in favor of PSS.  PSS has never served any discovery requests directed to Grossman personally or JMG-MA.  <u>Id</u>. at ¶¶39-41.

### <u>Mr. Grossman's Stage IV Cancer Diagnosis & Ongoing Treatment</u>

When Mr. Grossman was served with the Verified Complaint in this action, he was troubled to see several false and vague allegations made by PSS, including amorphous and conclusory allegations that he had made supposed "misrepresentations" to PSS over 12 years ago regarding Puck's finances, and that he made supposed "misrepresentations" to PSS, apparently in 2015, "that the assets of Puck were not being transferred to JMG-NY."  Mr. Grossman has never made any such representations to PSS.  Mr. Grossman was also deeply troubled to see that PSS seeks to enjoin him from using any of his personal assets, particularly given his health condition.  Specifically, in January 2024, he was diagnosed with Stage IV lung cancer, and since his diagnosis has been undergoing extensive treatment for his cancer with the Dana Farber Cancer Institute, including chemotherapy.  His doctors have also recommended that he begin radiation therapy to treat the cancer that has spread to his brain, and he is scheduled to begin this treatment imminently.  Mr. Grossman needs access to his personal assets to provide for his cancer treatment and care, and to care for his family.  <u>Id</u>. at ¶¶62-64.

### <u>ARGUMENT</u>

As made clear by the U.S. Supreme Court, a "preliminary injunction is an extraordinary remedy" that is not to be granted lightly.  <u>Winter</u>, 555 U.S. at 24 (reversing grant of preliminary

injunction).  Injunctive relief is "to be used sparingly, and only in a clear and plain case." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp.2d 110, 117, n.2 (D. Mass. 2010) (denying injunction).  Indeed, a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis added).  A plaintiff seeking a preliminary injunction must carry its burden of persuasion and establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of harms tips in its favor; and (4) the injunction is in the public interest.  Rohm, 759 F. Supp. 2d at 117-118.

The burden on the movant is even greater where, as here, it wants the Court to alter the status quo.  A preliminary injunction should not be granted where the status quo would be altered absent extraordinary circumstances.  See Chiara, 59 F. Supp. 2d at 196 (denying motion for a preliminary injunction; "the First Circuit has cautioned that a preliminary injunction that has the effect of disturbing, rather than preserving, the status quo 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief'"). No such circumstances are present here, to put it mildly.  To the contrary, every factor mandates denial of PSS' motion for injunctive relief.

## I.   PSS' MOTION SHOULD BE DENIED BECAUSE IT HAS NO LIKELIHOOD, MUCH LESS A STRONG LIKELIHOOD, OF SUCCESS ON ITS CLAIMS

"The sine qua non of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  Rohm, 759 F. Supp. 2d at 118.  Further, the First Circuit has instructed that "[t]o demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail."  Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012).  PSS has not only failed to establish a strong likelihood of success on its claims against Mr. Grossman and

JMG-MA:  it has established no likelihood of success.  Indeed, PSS has not identified a **single case** where a judgment creditor has been allowed to hold a prior company owner individually liable for a judgment rendered against the company **more than six years earlier**, where the owner was not even joined as a party in the prior action.[4]  And that is for good reason: as established below, PSS' claims are barred.

### A.    Plaintiff Has No Likelihood of Success on its "Alter Ego" Declaratory Judgment Claim

The extremely high bar PSS must clear to demonstrate entitlement to preliminary injunctive relief is set even higher because PSS seeks to disregard the corporate form of Puck (a Delaware LLC) and JMG-NY (a New York corporation) declare Mr. Grossman an alter ego of those companies.  As a matter of Delaware and New York law, the owner or officer of a limited liability company or corporation is not liable for debts of the entity.[5]  See, e.g., Doberstein v. G–P Industries, Inc., 2015 WL 6606484, at *4 (Del. Ch., Oct. 15, 2015) (dismissing claim against president of Delaware corporation; "Delaware public policy does not lightly disregard the separate legal existence of

---

[4] In its motion, PSS cites a hodgepodge of Massachusetts cases in support of its argument that this Court should hold Mr. Grossman liable for the debts of the Delaware and New York entities, Puck and JMG-NY.  None of these cases are applicable to the facts here, and fall into the following irrelevant categories: (1) cases where a parent corporation "dominate[d] the subsidiary in a pervasive manner that necessitates treating the dominated corporation as an agent of the principal." Devlin v. WSI Corp., 833 F.Supp. 69, 74 (D. Mass. 1993); see also In re Lernout & Hauspie Securities Litigation, 337 F. Supp. 2d 298 (D. Mass. 2004), and; (2) cases where an individual owner simultaneously operated multiple, thinly capitalized entities that functioned a single enterprise, disregarded corporate formalities, and commingled assets by using the funds of one corporation to pay the debts of another and for personal expenses.  See Zimmerman v. Cambridge Credit Counseling Corp., 529 F. Supp. 2d 254, 272 (D. Mass. 2008); Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 (2000); Smith v. Chase, 56 Mass. App. Ct. 1113 (2002).  Here, Puck, JMG-NY, and JMG-MA did not conduct business simultaneously, were not in a parent-subsidiary relationship, made their own separate corporate and tax filings, maintained independent bank accounts, and did not commingle corporate and personal assets.  See Grossman Decl. at ¶¶42-61; Gross Decl. at ¶¶16-35.

[5] Del. Code Ann. tit. 6, § 18-303 ("the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company"); Garcia v. Global Property Services, Inc., 2018 WL 2364154, at *6 (N.Y. Sup. Ct. Apr. 11, 2018) ("A corporation exists independently of its owners, as a separate legal entity, thus, its owners are normally not liable for the debts or torts of the corporation…Indeed, the law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability")

corporations"); <u>Treeline Mineola, LLC v Berg</u>, 2005 WL 2292056 (N.Y.A.D. 2 Dept., Sep. 19, 2005) (declining to hold sole shareholder, officer, and director liable for debt of New York corporation; "in view of the well established fact that a business can be incorporated for the very purpose of enabling its proprietor to escape personal liability, the corporate form is not lightly to be disregarded.").  In recognition of this principle, Delaware and New York courts have established that the standard for piercing the corporate veil is a demanding one, and that the veil may be pierced only with reluctance and in exceptional circumstances.  <u>Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood</u>, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task."); <u>TNS Holdings, Inc. v. MKI Sec. Corp.</u>, 703 N.E.2d 749, 751 (NY Ct. App. 1998) ("[t]hose seeking to pierce a corporate veil. . .bear a heavy burden").  No such circumstances are present here, and PSS has not come remotely close to meeting the daunting standard under either Delaware or New York law.  <u>See</u> <u>Harrison v. NetCentric Corp.</u>, 433 Mass. 465, 471-472 (2001) (Massachusetts applies the law of the state of incorporation in matters relating to corporate affairs and governance).

### i.   *PSS' Alter Ego Claims Are Barred By Res Judicata*

PSS' request for this Court to declare Mr. Grossman and JMG-MA liable for the judgments rendered against Puck and JMG-NY fails because it is plainly barred by the doctrine of res judicata, which "precludes the parties or their privies from relitigating claims that were raised or <u>could have been raised</u> in [a prior] action."  <u>Mass School of Law at Andover, Inc. v. American Bar Association</u>, 142 F.3d 26, 37-38 (1st Cir. 1998) (emphasis added) (affirming motion to dismiss; res judicata barred subsequent claims that arose from the same operative facts as the prior proceeding and could have been brought in prior proceeding).  Here, PSS seeks to claim that Grossman is an alter ego of Puck and therefore personally liable for the breach of contract judgment against Puck under the 2012 Agreement.  PSS plainly could have raised that claim **more than six years** ago in the 2018

Arbitration, but chose not to do so.  Similarly, JMG-NY has been listed on the New York Secretary of State's website since 2014, yet PSS neither sued Mr. Grossman nor JMG-NY in the 2018 Arbitration.

Similarly, in the 2022 ancillary arbitration, PSS did not sue Mr. Grossman or claim that he was personally liable for Puck's breach of the 2012 Agreement, <u>even while</u> asserting that JMG-NY was the alter-ego of Puck.  As a result, PSS veil-piercing claims against Mr. Grossman are barred. <u>See</u> <u>Doe</u>, 216 F.3d at 161-62; <u>Aunyx Corp.</u>, 978 F.2d at 6-7 (affirming dismissal given that res judicata barred claims brought by plaintiff's alleged alter-ego given prior agency adjudication involving plaintiff); <u>Safeguard Properties</u>, 2022 WL 16838781, *5 (dismissing alter-ego claims against individual sole owner of corporate arbitration respondent because they were barred by res judicata given the prior arbitration).[6]

### ii.  *PSS' Alter Ego Claims Are Barred By the Statute of Limitations*

PSS' alter-ego claims are also barred by the statute of limitations.  While Massachusetts courts have not squarely addressed the applicable limitations period to veil-piercing claims, the Massachusetts Supreme Judicial Court has held that in the context of analyzing whether a veil piercing claim survives the death of a defendant, the court "look[s] to the underlying claims to decide whether a cause of action survives." <u>Kraft Power Corp. v. Merrill</u>, 464 Mass. 145, 46 (2013).  Other courts have applied this approach to hold that that a "party seeking to pierce the corporate veil under an alter-ego theory is bound by the limitation period applicable to the cause of action to which the alter-ego claim is tied." <u>Specialty Companies Grp., LLC v. Meritage Homes of Arizona, Inc.</u>, 492 P.3d 308, 309 (Ariz. 2021) (affirming trial court's dismissal; "we hold that Specialty Companies Group's

---

[6] <u>See also</u> <u>Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.</u>, 976 F.3d 585, 591 (5th Cir. 2020) (affirming Rule 12(b)(6) dismissal based on res judicata; "Plaintiffs' alter-ego claim could have and should have been brought in the [prior] litigation"); <u>Universitas Educ., LLC v. Benistar</u>, 2021 WL 965794, at *11-16 (D. Conn. Mar. 15, 2021) (granting Rule 12(b)(6) motion to dismiss claims against entities that were not parties to prior action, but were allegedly "alter-egos" of the judgement-debtors based on res judicata).

alter ego claim is bound by the statute of limitations for breach of contract and is time-barred."); <u>see</u> <u>also</u> <u>Specialty Cos. Grp. LLC v. Meritage Homes of Ariz. Inc.</u>, P.3d 454, 459–60 (Az. App. Ct. 2020) (collecting cases from courts in other states).

Here, PSS' alter ego claims against Mr. Grossman are tied to its breach of contract claim arising from the 2018 Arbitration in which it alleged that it was not paid commissions in 2016, 2017, and 2018. The 2012 Agreement provides that it is governed by Finnish law. <u>See</u> Grossman Decl. Ex. B at §2.10. Under Finland law, a debt "becomes time-barred" three years from "the due date if it is specified in advance in a manner binding on the debtor." <u>See</u> Fin. Act On the Limitation of Debts (Law 728/2003) at §§4,5. Under the 2012 Agreement, commission fees "shall be distributed annually on the 30th of June," and "[b]onuses and other fees that cannot be distributed on the 30th of June shall be distributed on 15th of September." <u>See</u> Grossman Decl. Ex. B at §2.4.9. Therefore, any claim against Mr. Grossman expired, at the very latest, in September 2021.

**C.     PSS Has Utterly Failed To Establish Any Fraudulent Conveyances Of Any Kind By Mr. Grossman Or JMG-MA**

PSS' Complaint is bereft of any viable fraudulent conveyance, as matter of law, against Mr. Grossman or JMG-MA. Indeed, PSS only points to two dated transactions: Puck's closure of its empty bank account in 2018, and Mr. Grossman's sale of his New York home in 2021. Neither was a fraudulent conveyance. As an initial matter, neither transaction was made with the intent to defraud PSS, and PSS has offered **<u>no evidence</u>** of any such intent. As detailed above, Puck ceased its business operations in 2015—**<u>years</u>** before PSS filed the 2018 Arbitration. Puck conducted no business after 2015, and its bank account was inactive and had a zero balance seven months prior to its closure in July of 2018. This, of course, is fatal to PSS' claims. <u>See Admiral Metals Servicenter Co.</u>, 2003 WL 369709, at *6 (granting summary judgment; "Prior to these transfers, there was no actual or threatened litigation. In fact, the present litigation began several years later"); <u>Auburndale Plaza, LLC v. Sarni</u> <u>Cleaners of Framingham, Inc.</u>, 1999 WL 1203786, at *4 (Mass. Super. Oct. 29, 1999) (granting

summary judgment where the "transactions occurred almost three years before" litigation was filed, and record was "quite sparse" as to intentions of defendants at time of transfer).

Similarly, Mr. Grossman and his wife decided to sell their marital New York home for reasons wholly unrelated to PSS, and at a time when there were no claims, judgment or threatened claims against Mr. Grossman.  Further, Mr. Grossman's New York family home has never been owned by Puck or any other entity, and PSS has never obtained a judgment against Mr. Grossman.  As such, PSS has never been entitled to reach Mr. Grossman's home, and for that additional reason its fraudulent conveyance claim fails as a matter of law.  See Alford, 83 Mass. App. Ct. at 828 (affirming dismissal; "[w]here a creditor 'could not have reached the property before the conveyance, it follows that the conveyance itself could not have been fraudulent as to him'").

### D.      PSS' Conclusory Fraud Claim Fails as a Matter of Law

Count III of PSS' Complaint purports to assert to a claim for fraud against Grossman based upon vague and conclusory allegations that he: (1) made unidentified "personal misrepresentations. . .that Puck was solvent" which allegedly induced PSS to enter into the 2012 Agreement with Puck, and (2) made purported "personal misrepresentations" at some unspecified time that "the assets of Puck were not being transferred to JMG-NY." Compl,, ¶¶ 62, 65.  PSS has utterly failed to meet its burden of demonstrating any likelihood of success on these claims.[7]

First, PSS' fraud claims also fail because they are barred by res judicata, for the very same reasons that its veil-piercing claim is barred by res judicata as established above in Section I.A.i.

Second, PSS' fraud claims are barred by the applicable three year statute of limitations under Massachusetts law, because they rely on allegations of purported misrepresentations made sometime

---

[7] Section 1 of the 2012 Agreement contains an integration clause, providing:  "This Agreement represents the entire understanding between Puck and PSS with respect to the subject matter hereof and this Agreement supersedes all previous representations, understandings, oral or written, between Puck and PSS with respect to the subject matter hereof and cannot be modified except in writing signed by all parties."

before the **2012** Agreement - - ***over 12 years ago***, and sometime around the creation of JMG-NY and

cessation of Puck's operations, which occurred in **2015** - - ***over 9 years ago***. These allegations fall far

outside the limitations period.  See Compl., ¶¶ 62, 65; G.L. c. 260, § 2A; <u>Brooks v. Citizens Bank of</u>

<u>Mass.</u>, 2020 WL 837375 (D. Mass. Feb. 20, 2020) (dismissing fraud claim where alleged conduct fell

outside three-year limitation period).

Third, PSS fails to even sufficiently plead a claim for fraud, let alone establish any likelihood

of success.  Indeed, fraud claims are subject to the heightened pleading standard under Fed. R. Civ.

P. 9(b), which requires a plaintiff to "specify 'the time, place, and content of an alleged false

representation.'" <u>United States ex. rel. Kelly v. Novartis Pharms. Corp.</u>, 827 F.3d 5, 13 (1st Cir. 2016)

(affirming dismissal of claim where fraud was not pled with particularity).  "Mere allegations of fraud,

corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too

conclusional to satisfy the particularity requirement, no matter how many times such accusations are

repeated." <u>Hayduk v. Lanna</u>, 775 F.2d 441, 443-44 (1st Cir. 1985).  PSS fails to clear even the baseline

pleading standard, much less the heightened standard required by Fed. R. Civ. P. 9(b).  It claims in

purely conclusory fashion that Grossman made "personal misrepresentations" to "PSS," at some

unspecified times.  It does not allege the time, place, manner, or particular content of any of these

alleged representations, and provides no evidence of any of these purported representations in support

of its motion.

Fourth, in light of 2012 Agreement's integration clause, PSS' fraudulent inducement claims

are barred because it cannot establish reasonable reliance, as a matter of law.  See <u>HSBC Realty Credit</u>

<u>Corp. v. O'Neill</u>, 2013 WL 362823 (D. Mass. Jan. 30, 2013) (dismissing claim; "reliance on

representations that contradict the terms of a written and integrated agreement. . .cannot support a

claim for fraud"); <u>Elias Bros. Restaurants v. Acorn Enter.</u>, 831 F. Supp. 920, 926 (D. Mass. 1993)

(dismissing fraud claim; "any and all earlier oral promises or representations were expressly

disclaimed").

## II. PSS HAS UTTERLY FAILED TO ESTABLISH THAT IT WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION, AS CONFIRMED BY ITS OWN SIX YEARS OF DELAY

"The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (affirming denial of preliminary injunction).  Irreparable harm means "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank, 370 F.3d at 162.  Rather, a movant seeking injunctive relief must make a "clear showing" that substantial and immediate irreparable harm is "likely," not just a possibility, in the absence of an injunction. Winter, 555 U.S. at 22 (reversing court for using too lenient "possibility" standard).  PSS has failed to make the required "clear showing" of irreparable harm.

First, the Complaint and motion are riddled with rank speculation and assertions made "on information and belief," See, e.g., Compl., ¶¶ 25, 29, 40 (allegations made "on information and belief"), id. at ¶¶ 48-49, 56-57 (vague allegations of unidentified "suspected transfer of property and/or assets").  PSS claims to be concerned that Mr. Grossman and JMG-MA will somehow wrongfully dissipate assets if injunctive relief is not granted, but has offered no evidence of any remotely recent statements or conduct by Mr. Grossman or JMG-MA sufficient to meet its burden. PSS' self-serving conjecture about what Mr. Grossman might possibly do at some unknown time in the future cannot form the basis for injunctive relief.  See Public Service Co. of New Hampshire v. Town of West Newbury, 835 F.2d 380, 383 (1st Cir. 1987) (affirming denial of preliminary injunction; "Speculative injury does not constitute a showing of irreparable harm."); Chuang

18

Investments, Inc. v. Marriott Family Restaurants, Inc., 1993 WL 304410, at *2 (D. Mass. 1993) (denying motion for preliminary injunction; allegations made on information and belief were "insufficient to demonstrate immediate and irreparable harm").

More fundamentally, the very nature of this lawsuit eviscerates PSS' claim of irreparable harm. PSS has no judgment against Mr. Grossman and JMG-MA, yet to seeks collect money damages from them on an arbitration award entered **six years ago** against Puck. The risk that a defendant will lack assets to answer a judgment is not irreparable harm; it is inherent in any civil litigation. See Evans, 30 Mass. App. Ct. at 737-38.

Moreover, PSS' **six (6) year** delay in seeking any relief, much less equitable relief, against Mr. Grossman demonstrates that it has no irreparable harm whatsoever. Indeed, courts have found delays of mere **months**—compared to the years of PSS' delay—to be fatal to preliminary injunction motions. See, e.g., Akebia Therapeutics, Inc. v. Azar, 443 F. Supp.3d 219, 231 (D. Mass. 2020) (denying injunction where plaintiff delayed three months after agency decision from which it was seeking injunctive relief); Media3 Techs., LLC v. Mail Abuse Prevention Sys., LLC, 2001 WL 92389, at *9 (D. Mass. Jan. 2, 2001) (delay of six months after learning of threatened harm demonstrated a lack of irreparable harm); Exeter Grp., Inc. v. Sivan, 2005 WL 1477735, *6 (Mass. Super. Ct. Mar. 24, 2005) (denying injunction because plaintiff delayed four months after learning of employee's conduct); see also Charlesbank, 370 F.3d at 163 ("[The plaintiff's] cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief"). On this basis alone, PSS' motion must be denied.

### III.  THE BALANCE OF HARMS MANDATES THE DENIAL OF ANY PRELIMINARY INJUNCTION AS IT WOULD INTERFERE WITH MR. GROSSMAN'S CANCER TREATMENT

Balancing harms requires the Court to weigh "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." Charlesbank, 370 F.3d at 162. In

stark contrast to PSS' complete lack of irreparable harm if an injunction does not issue, Mr. Grossman would be unjustifiably harmed if this Court grants PSS' broad request prohibiting him from "[t]ransferring, dissipating, liquidating, or otherwise disposing of any personal assets." He has Stage IV lung cancer and is actively undergoing treatment, including chemotherapy and brain radiation therapy.  He requires access to his assets to provide for his care and comfort, and that of his family, further mandating the denial of Plaintiff's motion.  See Farnam v. Walker, 593 F. Supp. 2d 1000 (C.D. Ill. 2009) (balance of harms weighed in favor of plaintiff; "If the plaintiff does not receive the care he needs, he will suffer pain, possible acute exacerbation of his cystic fibrosis, decreased quality of life and a decreased life expectancy").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction must be denied.

**JAY GROSSMAN and
JMG SPORTS AGENCY, INC.,**

By their attorneys,

 */s/ Joseph D. Lipchitz*
Joseph D. Lipchitz (BBO # 632637)
Jacob A. Tosti (BBO # 704007)
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA  02116
(617) 723-3300
joseph.lipchitz@saul.com
Dated:  October 8, 2024                jacob.tosti@saul.com

## CERTIFICATE OF SERVICE

I, Jacob A. Tosti, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 8, 2024.

 /s/ *Jacob A. Tosti*
Jacob A. Tosti